UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES LIABILITY
INSURANCE COMPANY,

               Plaintiff,

    -against-

WW TRADING CO., INC.; W&T
SEAFOOD CORP.; WONG TUNG, LLC;
and YOUYONG LIN,

              Defendants.
------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 28 2018 ★
BROOKLYN OFFICE

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
16-CV-3498 (CBA) (JO)

**AMON, United States District Judge:**

    Plaintiff United States Liability Insurance Company ("USLI") brings the instant declaratory judgment action against Defendants WW Trading Co., Inc. ("WW"); W&T Seafood Corp. ("W&T"); Wong Tung, LLC ("Wong Tung," and with WW and W&T, the "WW Defendants"); and Youyong Lin ("Lin"). In New York state court, Lin filed and later voluntarily dismissed with prejudice an action against the WW Defendants for an injury he sustained in the building where WW employees work. Each of the WW Defendants and Lin were included in this declaratory action arising out of the events in state court because—as participants in the state court action—they have a financial interest in the resolution of USLI's claims. USLI, which issued an insurance policy to WW, seeks a declaratory judgment either that (1) the insurance agreement is rescinded, or that (2) USLI "was not obligated to defend or indemnify [WW] in connection with" Lin's lawsuit because the policy does not cover his accident. (D.E. # 46; D.E. # 78-34 ("Pl. 56.1 Stat.") ¶ 2.) WW filed counterclaims seeking damages for (1) breach of contract and the implied duty of good faith and fair dealing and (2) bad faith, as well as a declaratory judgment that (3) the insurance policy covers the accident. (D.E. # 48 ("Counterclaims").) WW also seeks attorney's fees incurred in this declaratory judgment action. (Id.)

USLI and the WW Defendants have filed post-discovery cross-motions for summary judgment. (D.E. # 78, 84, 86.) USLI argues that: (1) the insurance policy issued to WW should be deemed rescinded because WW made material representations in its policy application; that (2) it has no duty to defend or indemnify WW in Lin's lawsuit because Lin's accident falls under two separate policy exclusions; and that (3) WW's counterclaims for breach of the duty of good faith and fair dealing and for bad faith should be dismissed. In response, WW argues that: (1) the insurance policy is enforceable and covers Lin's lawsuit; that (2) the court should reserve judgment on its bad faith claim; and that (3) it is entitled to recover attorney's fees.

For the reasons stated below, the Court finds that USLI is not entitled to rescission of the insurance policy, that a dispute of material fact precludes summary judgment on the issue of the duty to indemnify, that WW's breach of contract counterclaim may proceed, that USLI is entitled to summary judgment over WW's bad faith and implied covenant of good faith and fair dealing counterclaims, that USLI had a duty to defend WW in the underlying state-court action, and that WW is entitled to attorney's fees incurred while defending against this declaratory judgment action.

## BACKGROUND

The Court draws facts from the "cited materials" in the summary judgment briefing. Fed. R. Civ. P. 56(c)(1), 56(c)(3). The Court also considers Rule 56.1 statements that the nonmoving party admits as true or does not "materially dispute." Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 556 (2d Cir. 2012). In this case, the admissible evidence reveals few disputes of fact. The Court recounts the largely undisputed record and notes where the parties meaningfully dispute relevant facts. The Court "constru[es] the evidence in the light most favorable to" the nonmoving

party and draws "all reasonable inferences in [that party's] favor." Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017).

## I.   Introduction

Louis Wu ("Louis") is the majority owner and president of W&T, and the majority owner of Wong Tung. (D.E. # 79-31–36 ("Louis Aff.") ¶¶ 1–2, 5; D.E. # 79-37–47 ("Nellie Aff.") ¶ 3; see also D.E. # 78-9, 79-35 ("Wong Tung 30(b)(6) Dep.") at 6:7–15, 30:4–6.) W&T is a seafood wholesale distributor. (Louis Aff. ¶ 2; Nellie Aff. ¶ 3; D.E. # 79-26–30 ("Luong Aff.") ¶ 4.) Since 2007, Nellie Wu ("Nellie"), Louis' daughter, has been W&T's general manager, overseeing the company's operations. (D.E. # 85 ("Defs. Cross 56.1 Stat.") ¶ 6; see also Pl. 56.1 Stat. ¶ 16.)

Wong Tung owns 50 Franklin Avenue (the "Property"), a two-story commercial building in Brooklyn that includes a warehouse on the first floor and office space on the second. (Defs. Cross 56.1 Stat. ¶¶ 8–9; see also Pl. 56.1 Stat. ¶ 42.) Around 2010, W&T moved its business from a building in Manhattan to the Property. (Nellie Aff. ¶ 4.) W&T stores seafood in the warehouse. (Luong Aff. ¶ 4.)

Sometime before 2010, Louis hired Han Luong ("Luong") to "handle the deliveries of W&T's seafood product for W&T." (Nellie Aff. ¶¶ 4, 7; see also Luong Aff. ¶ 5.) To perform the task, Luong formed WW and made W&T its sole client. (Id.; Luong Aff. ¶ 3; see also Defs. Cross 56.1 Stat. ¶ 4.) Luong owns WW, which he describes as a "delivery business." (Luong Aff. ¶¶ 3, 5; see also Nellie Aff. ¶¶ 9–10.) WW testified that it has been operating at the Property since 2008 or 2009. (D.E. # 78-10, 79-29 ("WW 30(b)(6) Dep.") at 87:15–25.)

## II.   Daily Operations at the Property

Luong generally starts his day at the Property around 8:00 a.m., before the arrival of W&T employees, and he sometimes works on days when he expects no W&T employees will be there.

(See WW 30(b)(6) Dep. at 68:17–71:9, 71:14–16; Luong Aff. ¶¶ 7–8.)  Luong and Louis both testified that because of Luong's work schedule, W&T provided him and another WW employee with keys to open the Property and a gate guarding two freezers in the warehouse.  (Id.; Pl. 56.1 Stat. ¶¶ 39–40; Louis Aff. ¶ 10; see also Pl. 56.1 Stat. ¶ 43.)  Only one other person has keys to the warehouse and the gate.  (Wong Tung 30(b)(6) Dep. at 44:16–45:6, 46:8–22; WW 30(b)(6) Dep. at 68:21–69:19.)

When W&T employees arrive, they make an inventory of the seafood product in the first-floor warehouse and keep track of the food on their computer system.  (Nellie Aff. ¶ 11; D.E. # 78-8, 79-46 ("W&T 30(b)(6) Dep.") at 15:5–16:10.)  Although Wong Tung testified that only WW employees use the first floor, (Wong Tung 30(b)(6) Dep. at 61:15–62:16), W&T testified that its employees take samples of seafood product kept there, (see W&T 30(b)(6) Dep. at 12:3–14.)

WW performs other tasks at the Property.  Its employees work throughout the first floor, both in the warehouse and an office located there.  (Wong Tung Dep. at 61:15–62:16.)  WW employees stage the seafood product and remove any that is "not sellable" as "high-quality product."  (W&T 30(b)(6) Dep. at 12:4–14, 32:8–23.)  They also transport the seafood product between trucks outside the Property and freezers inside the first-floor warehouse.  (W&T 30(b)(6) Dep. at 10:7–12:14; Wong Tung 30(b)(6) Dep. at 43:14–44:15, 48:2–15; see also WW 30(b)(6) Dep. at 87:15–25, 88:13–90:22.)  WW employees remove boxes of frozen seafood from freezers, place them onto wooden pallets, and operate forklifts to move the pallets to the outside loading dock.  (Pl. 56.1 Stat. ¶ 13; Defs. Cross 56.1 Stat. ¶ 19; Luong Aff. ¶ 5; see also Wong Tung 30(b)(6) Dep. at 44:7–15; WW 30(b)(6) Dep. at 129:20–24; Nellie Aff. ¶ 10.)  WW employees have been using motorized forklifts since they started working at the Property.  (See WW 30(b)(6) Dep. at 87:15–25, 88:13–90:22; see also W&T 30(b)(6) Dep. at 10:7–12:14; Wong Tung 30(b)(6) Dep. at

4

43:14–44:15, 51:3–21.)  W&T owns the forklifts, but the keys are kept in the first-floor office used by WW.  (Defs. Cross 56.1 Stat ¶ 20; Pl. 46.1 Stat. ¶ 28.)

W&T and WW employees also work together on certain tasks.  For instance, at the order of W&T employees, WW employees pack the seafood and move it throughout the warehouse.  (Nellie Aff. ¶ 10; Luong Aff. ¶ 6; Pl. 56.1 Stat. ¶ 20.)  And although WW employees do not have access to W&T's computer inventory system, employees from both companies gather invoice information to add to the system.  (W&T Dep. at 13:3–14:24, 24:12–17.)

### III.   Insurance Policy

In 2014, WW sought general liability insurance.  (See Nellie Aff. ¶ 13.)  Nellie referred Luong to a broker named Bret Pahwul ("Pahwul"), who served as president of Harbor Financial Partners, LLC.  (Id.; Defs. Cross 56.1 Stat. ¶ 24; W&T 30(b)(6) Dep. at 55:8–57:15, 58:3–25; see also D.E. # 78-28–32 ("Gorski Aff.") ¶ 14; D.E. # 78-15–27 ("Myrtetus Aff.") ¶ 12; id., Ex. B.)  Because Luong did not read and understand English well, Nellie assisted him in speaking with Pahwul and purchasing insurance.  (Nellie Aff. ¶ 14; Luong Aff. ¶ 10; see also W&T 30(b)(6) Dep. at 56:6–25; 75:10–21.)  And although WW, Luong, and Nellie testified that WW has never employed her, (see WW 30(b)(6) Dep. at 14:19–15:15; Luong Aff. ¶ 10; Nellie Aff. ¶ 14), Luong authorized Nellie to help him fill out the insurance forms and to act as WW's contact person with USLI, (see WW 30(b)(6) Dep. at 13:12–14:15; Luong Aff. ¶ 15; Defs. 56.1 Stat. ¶ 30).  Another W&T employee, Crystal Cun ("Cun"), also helped Luong.  (See Defs. Cross 56.1 Stat. ¶ 27.)

#### A.    Insurance Application

To help WW obtain insurance from USLI, Pahwul provided a blank insurance application form published by the Gateway Underwriters Agency ("Gateway").  (See W&T 30(b)(6) Dep. at 66:10–20; Nellie Aff. ¶ 15; id., Ex. A; see also Gorski Aff. ¶ 14.)  Pahwul and Cun completed the

Gateway application based upon Cun's conversation with Luong. (WW Dep. at 59:2–62:12; W&T 30(b)(6) Dep. at 59:2–62:12, 65:17–68:14, 77:4–78:9; Defs. Cross 56.1 Stat. ¶ 31.) Cun emailed the Gateway application to Nellie, who reviewed it for accuracy and asked Luong to sign it. (W&T Dep. at 76:24-81:22, 83:19–84:13; WW Dep. at 115:19–116:3; Defs. Cross 56.1 Stat. ¶ 31.) Before Luong signed the Gateway application, Nellie had a short conversation with him about the form, but she did not translate it or explain any questions or answers on the form. (Id. at 81:23–84:13; Luong Aff. ¶ 11; Nellie Aff. ¶ 15.)

The signed Gateway application is dated January 27, 2014. (Pl. 56.1 Stat. ¶ 52; see also # 78-29 ("Application") at 3.) In the form, Luong identified WW as a "Trucker[]" business. (Gorski Aff. ¶ 17; Application at 2.) Luong also "acknowledge[d] that the information provided in th[e] Application is material to acceptance of the risk and the issuance of the requested policy by" USLI, and he "warrant[ed] that all information on th[e] application is true and correct." (Application at 1, 3.) Luong represented that WW "exclusively deliver[s] for W&T Seafood, a seafood wholesaler, to clients in the northeast," and that WW "owns & operates 6 delivery trucks." (Id. at 1; see also Defs. Cross 56.1 Stat. ¶ 33.)

In a section titled "Eligibility Criteria," the application asked questions about WW and its business. (See Pl. 56.1 Stat. ¶ 57; Defs. Cross 56.1 Stat. ¶ 34.) Luong answered "True" to the following statement: "No use of unlicensed vehicles or mobile equipment (including attached machinery)." (Application at 2.) Luong also answered "True" to the following statement: "No operations involving the warehousing of goods of others." (Id.)

Karen Gorski ("Gorski"), an underwriter for USLI, testified that the "information contained in [the] application" was "critical" to determine whether USLI "will insure a business' operations." (Gorski Aff. ¶¶ 1, 9.) Gorski testified that if USLI had known that WW used unlicensed vehicles

or mobile equipment, or that its operations involved the warehousing of others' goods, then USLI would not have issued the policy. (Id. ¶¶ 40–41.) Lauren Reiley ("Reiley"), an in-house attorney for USLI, testified to the same effect. (D.E. # 78-33 ("Reiley Aff.") ¶¶ 27–28.) Indeed, the USLI's underwriting guidelines for "Truckers," includes "Eligibility Criteria" for applicants. (Gorski Aff. ¶ 18, id., Ex. C at 3.) Among the "Ineligible Risks" are "[a]ny operation involving the warehousing of goods of others," and "[a]ny use of unlicensed vehicles or mobile equipment (including attached machinery)." (Gorski Aff., Ex. C at 3–4.)

**B.   Relevant Insurance Terms**

After Nellie forwarded the completed form to Pahwul, it was sent to USLI. (Pl. 56.1 Stat. ¶¶ 52–53.) Based solely upon that application, USLI awarded WW a commercial general liability insurance policy, effective from January 28, 2014, to January 28, 2015, that provided $1 million for a covered accident. (Id. ¶ 51; Defs. Cross 56.1 Stat. ¶ 43.)

The insurance contract (the "Contract") provides that USLI "will pay those sums that the insured becomes legally obligated to pay as damages"—except for "punitive or exemplary damages"—"because of 'bodily injury' . . . to which this insurance applies," and that USLI "will have the right and duty to defend the insured against any 'suit' seeking those damages even if the allegations of the 'suit' are groundless, false[,] or fraudulent." (D.E. 78-16 ("Contract") at 24[1], 42.) The Contract defines "bodily injury" as "bodily harm, . . . including required care [and] loss of services," (id. at 48), and "suit" as any "civil proceeding in which damages because of 'bodily injury' . . . to which this insurance applies are alleged," (id. at 20). The parties do not dispute that WW is an "insured"; that Wong Tung and W&T are not; or that, if none of the Contract's exclusions apply and the policy is enforceable, it covers Lin's accident.

---

[1] Page numbers are taken from the computer-generated pagination of the Contract found on ECF D.E. # 78-16.

The Contract includes two exclusions to the policy that USLI seeks to enforce against the WW Defendants in this case. The first will be referred to as the "worker-related exclusion," (id. at 45), and the second the "construction-related exclusion," (id. at 46).

## IV.   Lin's Accident

In August 2014, Sheng Qiang Lin ("Sheng Qiang") was hired to perform work at the Property. (See, e.g., Wong Tung 30(b)(6) Dep. at 69:9–72:4, 73:4–74:10, 82:15–83:3; Louis Aff. ¶¶ 13, 18; id., Ex. B.) The parties dispute whether W&T or WW hired Sheng Qiang. USLI argues that a September 9, 2014, email by Pahwul stating that "[t]he insured hired a painter to do some work on the premises when one of WW Trading Co's employees accident[ally] knocked him off his la[dder], and he broke his ankle" indicates that WW hired him. (Myrtetus Aff., Ex. B.) Louis testified that he hired Sheng Qiang to work for W&T. He proffered an Internal Revenue Service Form 1099-MISC showing that W&T paid $12,000 in compensation to Sheng Qiang, as well as a $12,000 check from W&T to Sheng Qiang. (Louis Aff. ¶¶ 13, 18; id., Exs. B–C.) WW and Luong also testified that WW had "no involvement at all" with Lin's work at the Property, that WW did not hire Sheng Qiang or Lin, and that the work was not done on behalf of WW. (WW 30(b)(6) Dep. at 146:11–19; Luong Aff. ¶ 16.)

Sheng Qiang was hired to install sheetrock insulation and to perform painting and scraping at the Property. (See Wong Tung 30(b)(6) Dep. at 82:15–21; Pl. 56.1 Stat. ¶ 46.) The sheetrock was installed over a "few hundred square feet" in the ceiling space over one of the first-floor freezers. (Wong Tung 30(b)(6) Dep. at 77:22–80:21; see also Pl. 56.1 Stat. ¶¶ 47–48; Defs. Cross 56.1 Stat. ¶ 52.) The parties dispute whether the painting and scraping were part of the sheetrock insulation or a separate task. USLI relies on Wong Tung's deposition testimony, which states that Sheng Qiang received $12,000 as lump sum for all of the tasks, and that he was tasked to "paint

the sheetrock" after its installation. (Wong Tung 30(b)(6) Dep. at 80:22–81:7, 82:15–84:2.) In addition, Nellie's state-court affidavit described the project as "certain renovation work, including installation and painting," at the Property. (D.E. # 78-12 ¶ 4.) Meanwhile, the WW Defendants point to other parts of Wong Tung's deposition testimony, which states that the painting and scraping constituted a separate "part" of Sheng Qiang's work, that the tasks were performed in a "different part of" the Property and to "clean up areas that needed to be painted." (Id. at 85:14–86:15; see also Louis Aff. ¶¶ 14–15.) Louis also testified that the painting made certain poles and beams in the first floor "look cleaner." (Louis Aff. ¶ 17; see also Defs. Cross 56.1 Stat. ¶ 53.)

Lin's incident occurred on August 26, 2014. (Luong Aff. ¶ 15.) He was on a ladder at the time, scraping ceiling beams to prepare them for painting. (Pl. 56.1 Stat. ¶¶ 14, 49.) While moving a loaded pallet from one of the freezers to the loading dock using a forklift, Luong struck Lin's ladder and caused him to fall. (Id. ¶¶ 14, 29.) After learning about the incident, Nellie contacted Pahwul so that he could provide notice to USLI. (Nellie Aff. ¶ 23.) Pahwul sent an email to USLI on September 9, 2014, telling the company to contact Nellie "for further details." (Id., Ex. B; see also Myrtetus Aff., Ex. B; Pl. 56.1 Stat. ¶¶ 64–66.) Carol Ann Myrtetus—one of USLI's claims representatives—called Nellie that day. (Pl. 56.1 Stat. ¶ 67) Nellie told Myrtetus that Lin was painting on a ladder, and that Luong, a WW employee, drove a forklift into the ladder. (D.E. # 79-25 ("Myrtetus Dep.") at 48:2–16; Nellie Aff. ¶ 24; Myrtetus Aff., Ex. C.)

## V.    USLI's Reaction

Myrtetus issued an insurance coverage disclaimer letter dated September 26, 2014. (Myrtetus Aff. ¶ 16.) She stated that USLI received notice that, while Lin "was on a ladder[,] one of WW Trading Co., Inc.'s employees struck the ladder with a forklift." (D.E. # 78-19 ("9/26/14 Letter") at 1.) The letter quoted verbatim the worker-related and construction-related exclusions

mentioned above. (See id. at 2–4.) The letter also stated that, because "this arises from 'bodily injury' to a contractor or subcontractor or to an 'employee' of a contractor or subcontractor, or a 'casual laborer[,]' the Company disclaims coverage on the basis of" the worker-related exclusion. (Id. at 3.) She continued: "To the extent that the work performed by claimant when he was injured was 'construction operations', the Company disclaims coverage on the additional basis of" the construction-related exclusion. (Id. at 4.)

On October 22, 2014, Lin filed a state lawsuit against W&T and Wong Tung, but not WW, in the Supreme Court of New York, Kings County. See Lin v. W&T Seafood Corp., No. 509784/2014, D.E. # 1 (N.Y. Sup. Ct. filed Oct. 22, 2014). On November 7, 2014, USLI sent WW a Notice of Nonrenewal of Insurance. (Defs. Cross 56.1 Stat. ¶ 66; see also Nellie Aff. ¶ 29; Gorski Aff. ¶ 26; D.E. 78-32 ("Nonrenewal Notice") at 1.) The nonrenewal notice states that WW's insurance policy "will cease" on January 28, 2015, and that USLI "will not renew this policy when it expires." (Nonrenewal Notice at 1.) The notice states as the "reason for nonrenewal":

> During the expiring term[,] there was a claim stemming from the use of a forklift in a warehouse. Per the submission[,] the insured did not use any mobile equipment such as a forklift in their operation. In addition[,] per the submission[,] [t]he insured was not involved in the warehousing of goods of others. The insured is working entirely out of the warehouse of W&T Seafood, which shares a common ownership with the insured.

(Id.) Gorski acknowledged that "[t]ypically, when you non-renew a policy, it maybe[] i[s] a little bit harder to rescind the policy . . . [b]ecause we have already taken an action on it, plus the evidence we had at the time of the nonrenewal was similar to what we had at rescission." (Gorski Dep. at 149:8–19.) Still, Gorski testified that, at the time, USLI lacked "any information indicating that prior to the time the USLI policy was issued," WW had engaged in warehousing or used forklifts. (Gorski Aff. ¶ 27; see also Gorski Dep. at 149:19–21.)

## VI.    WW's Reaction to the Lawsuit

Lin's lawsuit spurred Nellie to prepare two written leases for the WW Defendants. (See W&T Dep. at 41:6–43:24.) The first written lease stated that WW was leasing from Wong Tung only certain parking spaces at the Property from May 1, 2014, to April 30, 2019. (See id.; Luong Aff. ¶ 8; Pl. 56.1 Stat. ¶¶ 34–35.) Representatives of WW and Wong Tung signed the written lease and backdated the document to January 27, 2014.[2] (See D.E. 78-14 ("WW Lease") at 4–5; see also Luong Aff. ¶ 8.) The second written lease states that W&T leased from Wong Tung the first-floor warehouse, second-floor office space, and outdoor loading dock from June 1, 2014, to May 31, 2019. (See W&T Dep. at 41:6–43:24; Louis Aff. ¶¶ 7–8; id., Ex. A.) Like WW's written lease, W&T's written lease was backdated to January 27, 2014.[3] (Louis Aff., Ex. A at 5.)

On May 1, 2015, Lin amended his state-court complaint to add WW as a party. See Lin, D.E. # 16; (see also Pl. 56.1 Stat. ¶¶ 8, 74; Defs. Cross 56.1 Stat. ¶ 70). The amended complaint alleged that Lin "was working on [a] paint job on a ladder which was struck by a forklift"; that "[t]he employee of defendant WW Trading, at the time of the accident, was operating the aforesaid forklift in the course of his job with WW Trading and with the permission of defendant WW Trading"; that WW "owned" or "leased" the forklift; that WW had been a "tenant lessee" of the Property for at least a year; and that WW "maintained," "controlled," and "managed" the Property. Lin, D.E. # 16 ¶¶ 12, 20–22, 26, 31, 33, 35; (see also Pl. 56.1 Stat. ¶¶ 71–72).

---

[2] Luong testified that WW has never leased any part of the Property except for those outdoor parking spaces. (Luong Aff. ¶¶ 8–9; see also Louis Aff. ¶ 12.) Luong also testified that WW "has always leased the parking spaces from Wong Tung since . . . 2010," and that the lease "was just never reduced to writing" until the written lease dated January 27, 2014, (Luong Aff. ¶ 8).

[3] Louis testified that "W&T had always leased the [Property] from Wong Tung since 2010," that W&T "always" has paid rent for the two floors, and that the lease "was just never put in writing." (Louis Aff. ¶ 7.) Nellie also testified that W&T leases the Property from Wong Tung. (Nellie Aff. ¶ 5.)

Nellie forwarded a copy of the Lin amended complaint and other materials to Myrtetus in a July 13, 2015 email to give notice to USLI of Lin's state lawsuit. (Pl. 56.1 Stat. ¶¶ 72–73, 76; Defs. Cross 56.1 Stat. ¶¶ 73, 74; Nellie Aff. ¶ 31; id., Ex. E; Myrtetus Aff. ¶ 17; id., Ex. E.) In an attached letter, Nellie requested reconsideration of USLI's coverage disclaimer, asking the company to "advise right away whom [it] will be appointing to represent" WW. (Nellie Aff., Ex. E at 2–3; Myrtetus Aff., Ex. E at 2–3.) Myrtetus replied thirty minutes later, highlighting Lin's allegations that WW hired Sheng Qiang. (Nellie Aff., Ex. F at 2.) "Accordingly," Myrtetus continued, "we maintain our coverage disclaimer; this loss is excluded by [the worker-related exclusion], which was cited in our 9/26/14 letter." (Id.) Myrtetus stated that USLI "will not retain counsel to defend WW Trading." (Id.) Her email does not mention the construction-related exclusion. (See id.) In response about two hours later, Nellie wrote that WW "will move forward with hiring a firm to defend [its] interests in this matter . . . ." (Id., Ex. G at 2.)

In a letter dated July 23, 2015, Myrtetus wrote that USLI reconsidered its denial of coverage. (See D.E. # 78-21 ("7/23/15 Letter") at 1–2.) Myrtetus said that USLI retained counsel from Carle Place, New York, to provide a "full defense" for WW in the lawsuit, but that USLI "will not indemnify [WW] for any settlement of judgment arising from" Lin's lawsuit. (Id. at 1–2.) The July 23, 2015, letter otherwise mimicked the worker-related and construction-related exclusion language found in the September 26, 2014 letter. (See id. at 2–3.)

## VII.   Rescission

After the WW Defendants answered in the state lawsuit, discovery proceeded. Lin deposed W&T on March 29, 2016. (Nellie Aff. ¶ 40; id., Ex. J.) In the deposition, W&T testified that WW transported and packed seafood since at least July 2011; that WW employees operated forklifts to transport the seafood; and that only WW employees operated the forklifts. (Nellie Aff., Ex. J at

33:3–12, 51:7–14, 56:14–18.) On April 1, 2016, Myrtetus received a report from WW's defense counsel about W&T's deposition. (Defs. Cross 56.1 Stat. ¶ 86.) Lin also deposed WW on April 13, 2016. (Luong Aff. ¶ 24; id., Ex. D.) In the deposition, WW testified that its employees used forklifts more than 50 times a day to transport seafood and that only they used the forklifts at the Property. (Luong Aff., Ex. D at 34:10–35:23.) On May 6, 2016, Myrtetus received a report from WW's defense counsel about WW's deposition. (Defs. Cross 56.1 Stat. ¶ 87.)

On the recommendation of Steven Verveniotis, USLI's outside counsel in this action, the insurance company first considered whether to seek rescission of the insurance policy in May 2016. (Gorski Aff. ¶ 31; Reiley Aff. ¶ 10; see also Pl. 56.1 Stat. ¶ 81.) On May 27, 2016, Myrtetus received transcripts of W&T's and WW's depositions, as well as the WW Defendants' two depositions of Lin. (Defs. Cross 56.1 Stat. ¶ 88; see also Myrtetus Aff. ¶ 36; D.E. # 79-1–25 ("Fini Decl."), Ex. M ¶ 3.) Four days later, Myrtetus forwarded to Verveniotis copies of all the deposition transcripts, as well as written leases and contracts involving Sheng Qiang and Lin's work. (Defs. Cross 56.1 Stat. ¶ 89; see also Myrtetus Aff. ¶ 36; id., Ex. J.)

No later than June 7, 2016, USLI's compliance department—specifically, Gorski and Reiley— "reviewed the matter and made the determination that the information available at the time . . . was not enough" to support a rescission claim. (Myrtetus Aff. ¶ 33; see also Gorski Aff. ¶ 32; Reiley Aff. ¶ 10.) In her affidavit, Gorski testified that "USLI did not have information . . . that indicated that prior to the time [of] the policy application," WW engaged in warehousing or used forklifts. (Id.) She also stated that she knew only that Lin's accident "took place, approximately eight months after the USLI [had been] issued, at a warehouse and involved the use of a forklift." (Id. ¶¶ 32, 33.) Gorski testified that she and Reiley "had not received or reviewed any deposition transcripts or summaries of depositions taken" in the state lawsuit. (Id.

13

¶ 33; see also Gorski Dep. at 173:25–174:9.)  Gorski further testified that USLI did not ask WW whether it engaged in warehousing or used forklifts "because making the inquiry is not something that is typical procedure and protocol." (Gorski Dep. at 152:3–153:8.)  After its decision, USLI made no further internal investigation as to whether to rescind the policy.  (Id. at 153:14–18.)  In a June 7, 2016 email to Verveniotis, Myrtetus wrote: "Our compliance department attorneys have discussed this themselves and they don't feel comfortable adding a rescission count, because we non-renewed the policy over a year ago, for the same reason." (Fini Decl., Ex. T at 2.)  Myrtetus told Verveniotis to prepare a complaint without a rescission claim.  (Id.)

USLI filed the instant action on June 24, 2016.  (D.E. # 1.)  USLI sought a declaratory judgment that "it has no duty to defend or indemnify" Defendants "for any and all claims and causes of action asserted" in the state lawsuit.  (Id. at 6.)  Discovery started on December 1, 2016.  (D.E. # 36.)  About four months later, Verveniotis "read the materials provided" to him from discovery in the Lin lawsuit and found a "good faith" reason for filing a rescission claim.  (D.E. # 78-1-14 ("Verveniotis Decl.") ¶¶ 26–29.)  Verveniotis made this determination based upon the deposition testimony from the lawsuit.  (Gorski Aff. ¶ 36; Reiley Aff. ¶ 21.)  In an email dated April 10, 2017, Myrtetus told Reiley that Verveniotis "would like to add" a rescission claim.  (Fini Decl., Ex. W at 3.)  After referencing the warehousing and forklift use mentioned in USLI's nonrenewal notice, Myrtetus said she and Verveniotis "learned that the insured has been doing this for years, well before they signed the application on 1/27/14." (Id.)  Myrtetus stated that they "learned" the new information "[f]rom the deps in the underlying claim . . . ." (Id.)

Two days later, Reiley told Verveniotis in an email that she "discussed with underwriting," and that "they support adding the count for rescission based on the information [he] discovered in the deposition transcripts." (Id. at 2; see also Gorski Aff. ¶¶ 35, 38; Reiley Aff. ¶¶ 20, 22.)  USLI

14

filed for leave to amend its complaint to add the rescission claim. (D.E. # 41.) In addition to the state-court depositions, USLI stated that unidentified "other evidence from the underlying [state] action" supported the claim. (Id.) The Honorable James Orenstein, United States Magistrate Judge, granted leave to amend on May 2, 2017, finding that "the record supports [USLI]'s position that, prior to receiving discovery in this case, it lacked sufficient evidence to allege that the representations in defendant WW's application were false when made." (D.E. # 44.)

USLI filed its Amended Complaint on May 4, 2017. (D.E. # 46.) In response, WW added a counterclaim for bad faith and a new breach of contact theory: that WW "belatedly assert[ed]" a rescission claim "when there is no basis for such a claim." (Counterclaims ¶¶ 41, 51–58.)

## STANDARD OF REVIEW

In its summary judgment motion, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In passing upon a Rule 56 motion the district court must determine whether there are issues of fact to be tried." United States v. One Tintoretto Painting Entitled The Holy Family with Saint Catherine & Honored Donor, 691 F.2d 603, 606 (2d Cir. 1982). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." Figueroa v. Mazza, 825 F.3d 89, 98 (2d Cir. 2016) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

"Once a party moving for summary judgment has made the requisite showing that there is no factual dispute, the nonmoving party bears the burden of presenting evidence to show that there is, indeed, a genuine issue for trial," Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001)—that is, the nonmoving party must undermine the moving party's presentation or "offer some hard

15

evidence showing that its version of the events is not wholly fanciful," Fed. R. Civ. P. 56(c)(1)(B); Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005). To warrant summary judgment, the Court must be convinced that "there can be but one reasonable conclusion as to the verdict, i.e., it is clear what the truth is." Rogoz v. City of Hartford, 796 F.3d 236, 246 (2d Cir. 2015).

## DISCUSSION

For the reasons set forth below, the Court finds genuine issues of material fact precluding a determination on USLI's duty to indemnify WW. However, the Court finds as a matter of law that the policy is valid and that USLI has a duty to defend WW. The Court also dismisses WW's breach of good faith and fair dealing counterclaim, finds WW's bad faith claim in favor of USLI, and declares WW's entitlement to attorneys' fees in this action.

### I.     Rescission

USLI contends that this Court should declare the insurance policy rescinded and therefore void ab initio. This motion is denied because USLI did not act promptly in asserting its rescission right and, in any event, ratified the contract on several occasions.

Under the New York Insurance Law, an insurer "may rescind an insurance policy if it was issued in reliance on material misrepresentations." Fidelity & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp., 540 F.3d 133, 139 (2d Cir. 2008). A rescinded policy is considered "void from its inception." Republic Ins. Co. v. Masters, Mates & Pilots Pension Plan, 77 F.3d 48, 52 (2d Cir. 1996). However, "New York law requires a party seeking rescission to act without unreasonable delay upon learning of the grounds for rescission." Cont'l Cas. Co. v. Marshall Granger & Co., LLP ("Cont'l Cas. I"), 6 F. Supp. 3d 380, 393 (S.D.N.Y. 2014), aff'd sub nom, Cont'l Cas. Co. v. Boughton, 695 F. App'x 596 (2d Cir. 2017). Parties may ratify a rescinded contract. U.S. Life Ins. Co. in City of N.Y. v. Blumenfeld, 938 N.Y.S.2d 84, 86 (1st Dep't 2012).

16

USLI asserts that WW falsely answered "True" to two statements in the Gateway application: (1) "No use of unlicensed vehicles or mobile equipment (including attached machinery)" and (2) "No operations involving the warehousing of goods of others." (Application at 2.) The Court need not consider whether these allegedly false answers were material misstatements because USLI unreasonably delayed its request for rescission and ratified the insurance policy by taking action inconsistent with its repudiation.

## A.   Unreasonable Delay

"[R]escission to be effective must be announced without unreasonable delay." Schenck v. State Line Tele. Co., 144 N.E. 592, 594 (N.Y. 1924). Accordingly, a party seeking rescission has the burden of proving—as an element of its claim—that it rescinded a policy "promptly after discovery" of a misrepresentation. Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank ("Banque Arabe"), 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994), aff'd, 57 F.3d 146 (2d Cir. 1995); see also Cont'l Cas. I, 6 F. Supp. 3d at 396; Davimos v. Halle, No. 03-CV-9199 (JGK), 2006 WL 859368, at *5–6 (S.D.N.Y. Mar. 31, 2006); Robinson v. Day, 960 N.Y.S.2d 397, 400 (1st Dep't 2013); cf. Cont'l Cas. Co. v. Boughton ("Cont'l Cas. II"), 695 F. App'x 596, 601 (2d Cir. 2017). If the insurer fails to make the showing, it is not entitled to the rescission remedy. See, e.g., SEC v. Credit Bancorp, Ltd., 147 F. Supp. 2d 238, 256–57 (S.D.N.Y. 2001), reconsideration denied, No. 99-CV-11395 (RWS), 2001 WL 1135652 (S.D.N.Y. Sept. 26, 2001); U.S. Life Ins., 938 N.Y.S.2d at 86; see also 22A N.Y. Jur. 2d Contracts § 564. In light of the equitable nature of rescission, promptness is a "fairly stringent requirement," and the Court must determine the reasonableness of any delay based upon the particular "facts of th[e] case . . . ." Ballow Brasted O'Brien & Rusin P.C. v. Logan, 435 F.3d 235, 239–40 (2d Cir. 2006) (quoting Banque Arabe, 850

F. Supp. at 1211). Contrary to what USLI argues, it is irrelevant whether the insured suffered prejudice. See, e.g., Banque Arabe, 850 F. Supp. at 1211 n.6.

Nonetheless, the insurer "is entitled to a reasonable period of time in which to investigate the potential basis for rescission." Cont'l Cas. I, 6 F. Supp. 3d at 394. The Court must first determine when USLI had sufficient notice of any potential misrepresentation to start the clock on its investigation. Courts impose a constructive-knowledge requirement on parties seeking rescission. See Banque Arabe, 850 F. Supp. at 1211. The parties need not have "[f]ull and complete knowledge"; rather, they need only "such notice of the facts as would impel a reasonable man in his position to make inquiry." Id. (quoting Johns Hopkins Univ. v. Hutton, 488 F.2d 912, 917 (4th Cir. 1973)); see also Zeladman v. Mutual Life Ins. Co. of N.Y., 53 N.Y.S.2d 792, 794 (1st Dep't 1945). After a reasonable period of time for investigation, the parties in a rescission action "will be chargeable with knowledge of all the facts which [a reasonable] inquiry would disclose." Id. (quoting Johns Hopkins University, 488 F.2d at 917).

USLI's delay in asserting rescission is unreasonable as a matter of law. USLI had sufficient notice of both potential misrepresentations no later than November 7, 2014. In a September 9, 2014 phone call, Nellie told Myrtetus that Lin was painting on a ladder, and that a WW employee drove a forklift into the ladder. (Myrtetus Dep. at 48:2–16; Nellie Aff. ¶ 24; Myrtetus Aff., Ex. B; Pl. 56.1 Stat. ¶ 7; Defs. Cross 56.1 Stat. ¶ 60.) Moreover, on November 7, 2014, USLI sent WW a nonrenewal notice in which it expressed concerns of both forklifting and warehousing. In the notice, USLI explained its reasons for "not renew[ing] [WW's] policy when it expires":

> During the expiring term[,] there was a claim stemming from the use of a forklift in a warehouse. Per the submission[,] the insured did not use any mobile equipment such as a forklift in their operation. In addition[,] per the submission[,] [t]he insured was not involved in the warehousing of goods of others. The insured is working entirely out of the warehouse of W&T Seafood, which shares a common ownership with the insured.

(Nonrenewal Notice at 1; see also Defs. Cross 56.1 Stat. ¶ 66; Nellie Aff. ¶ 29; Gorski Aff. ¶ 26.) This nonrenewal notice accuses WW of violating the very same portions of the Gateway application that now form the basis for the claim of rescission. Indeed, USLI issued the nonrenewal notice because it determined that WW's "operations involved the warehousing of goods of others," and that WW "used forklifts in those operations." (Gorski Aff. ¶¶ 25–27.) USLI did not notify the WW Defendants about a rescission claim until April 12, 2017, when it first sought leave to add a rescission claim to its pleadings in this action. Two years and five months passed between the issuance of the nonrenewal notice and the addition of the rescission claim. This delay was unreasonable as a matter of law. Cf. Asset Mgmt. Assocs. v. Emerson Telecom. Products LLC, 08-cv-2506 (TCP), 2011 WL 318100, at *4 (E.D.N.Y. Jan. 25, 2011) ("Rescission claims have consistently been dismissed due to failure to seek relief in less than one year.").

USLI contends that the phone call and nonrenewal notice informed it only that WW was warehousing and operating forklifts "at the time of [Lin]'s accident," (D.E. # 78-35 ("Pl. Br.") at 11.), not at the time WW completed the Gateway application, (Id.; see also Gorski Aff. ¶ 27; Gorski Dep. at 149:19–21). But discovery of the fact that WW was operating forklifts in a warehouse only a few months after signing the insurance policy would, in the very least, "impel a reasonable [insurer] in [its] position to make inquiry" into whether WW had been doing so all along. Banque Arabe, 850 F. Supp. at 1211. Once USLI had a "suspicion" that WW made misrepresentations, it was "incumbent upon [it] to pick up the scent and nose to the source." Id. (quoting Gannett, 428 F. Supp. at 828). Here, USLI failed to do so. Despite discovery and cross-motions on summary

judgment, the record reveals only two investigatory acts performed by USLI or its agents. In June 2016—one year and seven months after receiving notice—USLI's compliance department reviewed internal materials about Lin's accident and decided against rescission.[4] (Myrtetus Aff. ¶ 33; Gorski Aff. ¶ 32; Reiley Aff. ¶ 10.) Nine months later, Verveniotis reviewed materials from Lin's state-court matter and recommended pursuing a rescission claim. (See Verveniotis Decl. ¶¶ 26–29; Fini Decl., Ex. W at 2–3; Gorski Aff. ¶¶ 35–36, 38; Reiley Aff. ¶¶ 20–22.)

There is no evidence that USLI contacted WW about potential misrepresentations; Gorski testified that such contact "is not something that is typical procedure and protocol" for USLI. (Gorski Dep. at 152:3–153:8.) Nor is there evidence that USLI investigated the state-court materials that eventually led Verveniotis to recommend rescission. To the contrary, nine months passed between USLI receiving those materials and Verveniotis' recommendation of recission. (Defs. Cross 56.1 Stat. ¶ 89; see also Myrtetus Aff. ¶ 36; id., Ex. J.) USLI provides no explanation for why Verveniotis failed to review the state-court materials for nine months, despite receiving those materials before the original complaint was filed. Because USLI did not undertake a reasonable investigation, it is "chargeable with knowledge of all the facts which inquiry would disclose." Banque Arabe, 850 F. Supp. at 1211. Thus—even if the Court agreed that USLI did not have "substantial information regarding [WW's] misrepresentations" in November of 2014—USLI had constructive knowledge of WW's misrepresentations long before it filed its claim of rescission. Republic Ins. Co., 77 F.3d at 53.

"[E]vents and excuses" may "suspend the delay period," Banque Arabe, 850 F. Supp. at 1211, but USLI fails to identify a plausible excuse for the delay of its rescission claim. USLI makes only one excuse in its briefing. It claims that it believed WW did not have any warehousing

---

[4] As noted above, the compliance department didn't "feel comfortable adding a rescission count, because [USLI] non-renewed the policy over a year ago, for the same reason." (Fini Decl., Ex. T at 2.)

operations prior to the issuance of the insurance policy because a lease signed by WW and Wong Tung indicated that WW did not have a property interest in Wong Tung's warehouse. However, USLI learned that the WW lease was backdated (and possibly fraudulent) only after W&T's August 15, 2017 Rule 30(b)(6) deposition. (D.E. # 81 ("Pl. Reply/Cross Opp'n") at 29; see also W&T Dep. at 41:6–43:24; Luong Aff. ¶¶ 7–8; Pl. 56.1 Stat. ¶¶ 34–35.) USLI could not have been relying upon the leases for assurance that WW had no warehousing operations. USLI added its rescission claims in April 2017, months before it learned the leases had been backdated.

USLI also contends that Magistrate Judge Orenstein already decided the "unreasonable delay" issue in USLI's favor. (Pl. Br. at 9–10.) But Magistrate Judge Orenstein merely granted USLI leave to add the claim under the liberal Rule 15 of the Federal Rules of Civil Procedure. (See D.E. # 44); see also Fed. R. Civ. P. 15(a)(2). He did not decide the merits of the claim. Moreover, the ruling occurred in the middle of discovery. USLI represented to Magistrate Judge Orenstein that it had received the state-court materials during the discovery, (see D.E. # 41). Now that discovery has ended, the Court understands that USLI in fact received the state-court materials before its claims were filed. Law of the case applies "only if the parties had a full and fair opportunity to litigate the initial determination." Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 219 (2d Cir. 2002). WW lacked this opportunity in the middle of discovery. See, e.g., Davidson v. Bartholome, 460 F. Supp. 2d 436, 443 (S.D.N.Y. 2006). Accordingly, Magistrate Judge Orenstein's ruling does not preclude the Court's decision here.

Finally, USLI contends that a determination against it would be "inequitable" because WW would "get away with" misrepresentations. (Pl. Reply/Cross Opp'n at 32.) But the party seeking rescission may not exhibit "[d]elay and vacillation," even when the rescission right "had before

subsisted." Ballow Brasted O'Brien & Rusin, 435 F.3d at 240 (quoting McLean v. Clapp, 141 U.S. 429, 432 (1891)). By sleeping on its rights, USLI lost its ability to exercise them.

Therefore, the Court finds as a matter of law that USLI fails to establish that its rescission claim was brought without unreasonable delay.

### B.    Ratification

The Court further finds that USLI ratified the Contract. The WW Defendants argue the affirmative defense of ratification based upon three acts: (1) USLI's November 2014 nonrenewal notice; (2) the July 23, 2015 letter indicating that USLI would provide counsel but disclaim coverage in Lin's lawsuit; and (3) the June 24, 2016 filing of the original Complaint in this action.[5] The Court finds that the second and third acts ratified the insurance contract.

"[I]ntentional acts, performed in recognition of a contract as valid, result in a ratification of a previously voidable contract and bar rescission." Banque Arabe, 850 F. Supp. at 1212–13. "If, subsequent to the discovery of material misrepresentations, the party later claiming the right to rescind has continued to accept the benefits of the agreement or acted in some other fashion inconsistent with exercise of a right to rescind, that party will be deemed to have waived the misrepresentations and ratified the agreement." Cont'l Cas. I, 6 F. Supp. 3d at 397 (internal alterations omitted); see also Banque Arabe, 850 F. Supp. at 1212. Because ratification is an affirmative defense, the insured has the burden of proof. See Banque Arabe, 850 F. Supp. at 1213.

Ratification "requires evidence of a clear manifestation of intent, and cannot be lightly inferred." Cont'l Cas. I, 6 F. Supp. 3d at 397 (citation and internal quotation marks omitted). "Negligence or oversight is not enough to establish waiver." Metro. Life Ins. Co. v. Blum, 184 N.Y.S.2d 455, 457 (1st Dep't 1959), aff'd mem., 176 N.E.2d 202 (N.Y. 1961). Still, the Second

---

[5] In its cross reply brief, the WW Defendants attempt to add a fourth act for the first time: the September 26, 2014, letter disclaiming coverage over the accident. (Defs. Cross Reply at 19.) The Court deems this argument forfeited.

Circuit has held that, to ratify a policy, an insurer need possess only "adequate" information "to put [it] on notice" of the acts warranting rescission. Luria Bros. & Co., Inc. v. Alliance Assurance Co., Ltd., 780 F.2d 1082, 1091 (2d Cir. 1986); see also State of N.Y. v. AMRO Realty Corp., 936 F.2d 1420, 1431 (2d Cir. 1991). Prejudice is not a requirement. See, e.g., Sompo Japan Ins. Co. v. Norfolk S. Ry. Co., 762 F.3d 165, 191 n.36 (2d Cir. 2014).

USLI argues that there is not enough evidence that it had knowledge of the facts underlying its claim of rescission when it allegedly ratified the Contract. (Pl. Reply/Cross Opp'n at 21.) But for the reasons stated above, USLI had constructive knowledge no later than November 7, 2014. The remaining issue is whether three acts described above are "in some . . . fashion inconsistent with exercise of a right to rescind." See Cont'l Cas. I, 6 F. Supp. 3d at 397.

The Court is not persuaded that the November 7, 2014 nonrenewal notice ratified the Contract. See Cont'l Cas. I, 6 F. Supp. 3d at 399. A nonrenewal is a "decision not to enter into a new and separate contract" and does not necessarily confirm the policy already in existence. Id. Although the notice lacked an express reservation of the rescission right, (see Nonrenewal Notice at 1), nothing in the document expressly "precludes a later change of heart to then seek rescission," Cont'l Cas. I, 6 F. Supp. 3d at 399. The WW Defendants cite no case holding that the issuance of a non-renewal notice, "which is required by law," constitutes a sufficient basis for rescission, and the Court has found none. See id. at 400; cf. Cont'l Cas. II, 695 F. App'x at 598 (noting that the lower court "properly rejected" a ratification argument because the insurer "was legally compelled" to perform the act in issue). The WW Defendants cite GuideOne II to support finding ratification. (D.E. # 79 ("Defs. Opp'n/Cross Br.") at 16–17.) However, the case involved "both the insurer's sending the non-renewal letter and continuing to accept premium payments," Cont'l Cas. I, 6 F. Supp. 3d at 399–400 (emphasis in original), and the WW Defendants fail to point to

evidence suggesting that USLI did the latter.  Further, the Second Circuit has criticized <u>GuideOne</u> <u>II</u> as "unpersuasive" on the issue of ratification.  <u>See</u> <u>Cont'l Cas. II</u>, 695 F. App'x at 599 n.1.

Nonetheless, the Court finds that the issuance of the two other documents ratified the Contract as a matter of law.  In both the July 23, 2015 letter and the June 24, 2016 Complaint, USLI invoked policy exclusions but did not mention rescission.  The Court sees no meaningful distinction between this case and <u>Luria Brothers</u>, in which the Second Circuit found ratification based upon the insurer's assertion of some defenses but not others, <u>see</u> 780 F.2d at 1090.  In <u>Luria</u> <u>Brothers</u>, the underwriters disclaimed coverage based upon a policy exclusion and did not raise the issue of misrepresentation "until several years later."  <u>Id.</u>  The Second Circuit found ratification: "It is well settled that '[w]hen one specific ground of forfeiture is urged against the claim, and a refusal to pay is based upon a specific ground, all other grounds are waived.'"  <u>Luria</u> <u>Brothers</u>, 780 F.2d at 1090 (quoting 16C Appleman & Appleman, <u>Insurance Law and Practice</u> § 9260, at 393 (1981)).  Here, USLI invoked only the policy exclusions to the WW Defendants in the letter and Complaint even though it had constructive knowledge of its grounds for rescission. Under the logic of <u>Luria Brothers</u>, both records ratified the Contract.  <u>See id.</u>

* * *

Accordingly, with respect to USLI's rescission claim, the Court grants summary judgment in favor of the WW Defendants and against USLI.

## II.   Coverage

USLI alternatively requests a declaration that Lin's injury falls under the construction-related and worker-related policy exclusions, and that it therefore "was not obligated to defend or indemnify [WW] in connection with" Lin's lawsuit.  (Pl. 56.1 Stat ¶ 2.)  WW requests a declaration to the contrary.  (D.E. # 33 ¶ 56.)  For the reasons stated below, the Court denies USLI's motion

and grants partial summary judgment to the WW Defendants, finding that the worker-related exception does not apply but that a material dispute of fact regarding the applicability of the construction-related exclusion precludes summary judgment.

### A.    Notice of Disclaimer – Construction-Related Exclusion

The WW Defendants argue that the September 26, 2014 letter did not provide sufficient notice of disclaimer on the ground of the construction-related exclusion. (See Defs. Opp'n/Cross Br. at 30–32; D.E. # 88 ("Defs. Cross Reply") at 37–41.) The Court disagrees.

The New York legislature has created a statutory right for insureds to receive timely and specific notice of disclaimed coverage. See KeySpan Gas E. Corp. v. Munich Reins. Am., Inc., 15 N.E.3d 1194, 1197–99 (N.Y. 2014). In relevant part, § 3420(d)(2) of the New York Insurance Law provides that if "an insurer shall disclaim liability to deny coverage for . . . bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state, it shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage . . . ." Section 3420(d)(2) "is intended to ensure clear notice to insured parties of the precise exclusion that the insurer invokes." Atl. Cas. Ins. Co. v. Coffey, 548 F. App'x 661, 664 (2d Cir. 2013). Accordingly, the notice must "apprise the claimant with a high degree of specificity of the ground or grounds on which the disclaimer is predicated." Id. Still, the notice need not be "an example of excellence" and may contain errors. John v. Centennial Ins. Co., 458 N.Y.S.2d 350, 352 (3d Dep't 1983).

The September 26, 2014 letter provides rough details of Lin's accident and quotes verbatim both policy exclusions at issue here. (9/26/14 Letter at 1–4.) The letter also states: "To the extent that the work performed by claimant when he was injured was 'construction services', the Company disclaims coverage on the additional basis of" the construction-related exclusion. (Id.

at 4.) The WW Defendants read the words "To the extent" to mean that USLI was only reserving its right to disclaim coverage. (See, e.g., Defs. Cross Reply at 37, 39 n.19.) A reservation of rights does not constitute notice. See, e.g., Hartford Ins. Co. v. Cty. of Nassau, 389 N.E.2d 1061, 1062 (N.Y. 1979). The WW Defendants argue they did not receive notice of USLI's invocation of the construction-related exclusion until the original Complaint was filed. Not even USLI suggests that this would be timely under § 3420(d)(2). (See Defs. Opp'n/Cross Br. at 30.)

No reasonable juror would conclude that the September 26, 2014 letter was a reservation of rights. Having mentioned the employer-related exclusion, the letter clearly states that USLI "disclaims coverage on the additional basis of" the construction-related exclusion. (9/26/14 Letter at 4 (emphasis added).) The letter also quotes the exclusion verbatim. (Id.) Although the last paragraph of the letter includes language typically found in reservations of rights, (9/26/14 Letter at 4); see also, e.g., U.S. Fidelity & Guaranty Co. v. Treadwell Corp., 58 F. Supp. 2d 77, 86 (S.D.N.Y. 1999), that paragraph is not where the construction-related exclusion is invoked. A disclaimer notice remains effective even if it includes "'reservation of rights' language" somewhere else in the letter. See QBE Ins. Co. v. Jinx-Proof Inc., 6 N.E.3d 583, 584 (N.Y. 2014).

Read in context, the clause beginning "[t]o the extent" explains with specificity which aspect of the construction-related exclusion applies in this case. The exclusion addresses various types of work, such as "construction," "construction services," and "site preparation." (Contract at 46.) As the clause explains, USLI believed that Lin was performing "construction services." (Id.) The clause does not render the letter confusing to the reasonable reader. Nor is it merely a reservation of rights. Instead, the letter serves as a clear notice of disclaimer by "identif[ying] the applicable policy exclusion and set[ting] forth the factual basis for the insurer's position that the claim fell within a policy exclusion with sufficient specificity to satisfy the statutory mandate and

purpose." <u>Atl. Cas. Ins.</u>, 548 F. App'x at 664 (quoting <u>Adams v. Perry's Place</u>, 564 N.Y.S.2d 1019, 1019 (4th Dep't 1990)). The Court therefore rejects the WW Defendants' notice argument.

## B.   The Duty to Indemnify

"In liability insurance policies generally" and in the policy at issue here, "the insurer assumes both a <u>duty to indemnify</u> the insured—that is, 'to pay all covered claims and judgments against the insured'—and a <u>duty to defend</u> 'any lawsuit brought against the insured that alleges and seeks damages for a covered event, even if groundless, false[,] or fraudulent.'" <u>Texaco A/S (Denmark) v. Comm. Ins. Co. of Newark, NJ</u>, 160 F.3d 124, 126 (2d Cir. 1998). The duty to indemnify "is determined by the actual basis for the insured's liability to a third person." <u>Frontier Ins. Contractors, Inc. v. Merchants Mut. Ins. Co.</u>, 690 N.E.2d 866, 870 (N.Y. 1997). An insurer need not indemnify when the insured "is not factually or legally liable," or when "the occurrence is later proven to be outside the policy's coverage." <u>Id.</u> "[T]here can be no duty to indemnify unless there is first a covered loss." <u>Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford</u>, 477 N.E.2d 441, 444 (N.Y. 1985). "[T]he burden of proof will rest with the insurer to demonstrate that the loss compromised by the insured was not within policy coverage." <u>Id.</u> at 445.

As stated above, USLI invokes two policy exclusions in this action: (1) the worker-related exclusion, and (2) the construction-related exclusion. USLI argues that it had no duty to indemnify in Lin's lawsuit under these exclusions. For the reasons stated below, the Court finds that the worker-related exclusion does not apply. However, a factfinder at trial must determine whether USLI had a duty to indemnify in light of the construction-related exclusion.

### 1. Worker-Related Exclusion

USLI contends that it should not be required to indemnify against Lin's lawsuit because Lin's injury falls under the worker-related exclusion to WW's insurance policy. "In determining

a dispute over insurance coverage, [the Court] first look[s] to the language of the policy." Selective

Ins. Co. of Am. v. Cty. of Rensselaer, 47 N.E.3d 458, 461 (N.Y. 2016). "The threshold question

is whether the insurance policy is ambiguous, which is a matter of law for the court to decide."

Standard Gen. L.P. v. Travelers Indemnity Co. of Conn., 261 F. Supp. 3d 502, 507 (S.D.N.Y.

2017). But if "there is a reasonable basis for difference of opinion as to the meaning of" the

relevant insurance provision, then it is ambiguous, and the Court must construe it "in favor of the

insured." Selective Ins., 47 N.E.3d at 461.

The Court finds, as a matter of law, that the worker-related exclusion does not cover Lin's

accident. In relevant part, the worker-related exclusion states, "[t]his insurance does not apply to":

(1) "Bodily injury" to any "employee", "volunteer worker", "temporary worker" or "casual laborer" arising out of or in the course of:

(a) Employment by any insured; or

(b) Performing duties related to the conduct of any insured's business;

(2) "Bodily injury" to any contractor, subcontractor or any "employee", "volunteer worker", "temporary worker" or "casual laborer" of any contractor or subcontractor arising out of or in the course of the rendering or performing services of any kind or nature whatsoever by such contractor, subcontractor or "employee", "volunteer worker", "temporary worker" or "casual laborer" of such contractor or subcontractor for which any insured may become liable in any capacity.

(Contract at 7, 45.) Sub-provision (2) is at issue. Reduced to only the relevant language, that sub-

provision excludes from coverage, "Bodily injury to . . . any employee . . . of any

contractor . . . arising out of . . . performing services of any kind or nature whatsoever by

such . . . employee . . . of such contractor . . . for which any insured may become liable in any

capacity." Here is how the facts allegedly fit into that provision:

- Bodily Injury = Lin's injuries from falling off the ladder
- Employee = Lin
- Contractor = Sheng Qiang

28

- Performing Services = Painting and scraping
- Insured = WW

USLI contends that this exclusion "applies to bar coverage for Lin's injuries in that it is undisputed that he was employed by a contractor hired to do construction work at the warehouse, and specifically the first floor occupied by WW Trading, thereby 'related to the conduct of any insured's business.'" (Pl. Br. at 18.) Relying on United States Liability Ins. Co. v. Benchmark Construction Services, Inc. ("Benchmark"), 797 F.3d 116 (1st Cir. 2015), the WW Defendants argue that sub-provision (2) applies only when the injured party is a contractor of the insured, and that sub-provision (1) applies only when the injured party is an employee of the insured. (Defs. Opp'n/Cross Br. at 24–25.) USLI does not seriously dispute whether Benchmark provides the correct interpretation of the worker-related exclusion, but attempts to distinguish the case on the ground that it involved "a stipulated set of facts as to two different contractors working at the same construction site," which is "not the facts here," because "the evidence indicates that Lin's employer was hired by WW Trading." (Pl. Br. at 19–20.)

The Court agrees with the holding of Benchmark that the worker-related exception applies only to bodily injuries sustained by contractors who are in privity with the insured. 797 F.3d at 120–25; see also United States Underwriters Ins. Co. v. Affordable Housing Foundation, Inc., 256 F. Supp. 2d 176, (S.D.N.Y. 2003) aff'd 88 F. App'x 441 (2d Cir. 2004) ("The endorsement could not be clearer—the policy does not cover bodily injury as a result of work-related accidents, whether to employees of the named insureds or to the employees of contractors employed by the named insureds."); Merchants Mut. Ins. Co. v. Rutgers Cas. Ins. Co., 2011 WL 1004467, at *2–3, 243 N.Y.L.J. 54 (N.Y. Sup. Ct. 2010) aff'd 922 N.Y.S. 200 (2d Dep't 2011) ("[G]iven the plain meaning of the exclusion, its purpose is to relieve the insurer of liability for a claim arising out of bodily injury to an employee of a contractor in privity with the insured."). To hold otherwise

29

would condition coverage "on the coincidence of an injured party's contractual obligations in the world at large." Benchmark, 797 F.3d at 124. Why would an insurance policy exclude coverage for individuals injured by WW based solely on whether they are an employee or contractor of a random, third party (say Wal-Mart or Goldman Sachs)? The Court can see no reason.

That Lin was not a contractor of WW is not subject to genuine dispute. The evidence proffered by the WW Defendants is overwhelming. The president of W&T testified that he hired Sheng Qiang (who in turn hired Lin). WW and Luong testified that WW had "no involvement at all" with Lin's work; that WW did not hire Sheng Qiang or Lin; and that the work was not done on behalf of WW. (WW 30(b)(6) Dep. at 146:11–19; Louis Aff. ¶¶ 13, 18; Luong Aff. ¶ 16.) The WW Defendants proffered an Internal Revenue Service Form 1099-MISC showing that W&T paid $12,000 to Sheng Qiang, as well as a copy of W&T's $12,000 check to Sheng Qiang. (Louis Aff., Exs. B–C.) The only evidence offered by USLI to the contrary, the September 9, 2014 email by Pahwul stating that "[t]he insured hired a painter to do some work," does not create an issue of fact that is genuine. (See Myrtetus Aff., Ex. B.) Pahwul's email was internally inconsistent in its references and, in any event, was written by an individual unfamiliar with operations at the warehouse and the hiring practices of the WW Defendants. The Court finds as a matter of law that Sheng Qiang and Lin were hired by and responsible to W&T, not WW. Therefore, Lin's bodily injuries do not fall within the worker-related policy exclusion.[6]

---

[6] At oral argument, USLI attempted to argue that WW and W&T were in fact interchangeable entities. But neither in its initial brief nor its reply brief did the insurance company argue that W&T and WW were alter egos such that it was irrelevant which entity employed Sheng Qiang as a contractor. (See Br. at 19–20; Reply/Cross Opp'n at 44.) The Court deems the argument forfeited.

### 2. Construction-Related Exclusion

USLI also argues that Lin's injuries fall under the construction-related exclusion. That exclusion provides:

> This insurance does not apply to "bodily injury", "property damage", or "personal and advertising injury", or medical expenses arising out of any construction, "construction services", demolition, renovation or site preparations.

> "Construction Services" includes, but is not limited to, surveying, drafting, test borings, or inspections.

(Contract at 46.)

The WW Defendants argue that this exclusion applies only when WW or its agents are performing the "construction, 'construction services[,'] demolition, renovation[,] or site preparations." (Contract at 46.) For this argument, the WW Defendants cite to Benchmark's holding that the term "contractor" was ambiguous and should be construed to apply only to contractors hired by the insureds. (See Opp'n/Cross Br. at 29 (citing Benchmark, 797 F.3d at 124).) But the construction-related exclusion plainly has more breadth than the worker-related exclusion, targeting "any" construction, construction services, demolition, renovation, and site preparations. (Contract at 46.) It contains no limitation to "employees" or "contractors."

Nonetheless, the parties disagree about whether the work Lin was doing at the time of the accident qualifies as "construction services." USLI argues that the exclusion applies because Lin was scraping ceiling beams to prepare them for painting, which was "part of a larger project that also included installation of sheetrock." (Pl. Br. at 16–18.) The WW Defendants disagree, arguing that the painting and scraping constituted "separate, unrelated work" from the installation and was "routine 'clean up' work." (Defs. Opp'n/Cross Br. at 27–29; Defs. Cross Reply at 33–34.)

The Court finds genuine issues of material fact precluding a determination whether the exclusion applies. If Lin's scraping and painting was part of his larger project installing sheetrock,

31

his activities constitute "construction," "construction services," "renovation," or "site preparations." (Contract at 46.) Supporting this theory of Lin's work, Wong Tung testified that Sheng Qiang received $12,000 as lump sum for all of the tasks, and that he was tasked to "paint the sheetrock" after its installation. (Wong Tung 30(b)(6) Dep. at 80:22–81:7, 82:15–84:2.) In addition, Nellie testified that Lin's project involved "certain renovation work, including installation and painting." (D.E. # 78-12 ¶ 4.)

Under the WW Defendants theory of the case, Lin's painting and scraping were "clean up" work. USLI does not seriously contend that cleaning, separate and apart from a construction project, is a "construction service." And the record plausibly suggests that Lin's painting and scraping were unrelated to his sheetrock installation. Wong Tung's deposition testimony indicates that the painting and sheetrock installation were distinct "part[s]" of Sheng Qiang and Lin's work, and that the painting and scraping occurred in a "different part of" the Property from where the installation occurred. (Id. at 85:14–86:15; see also Louis Aff. ¶¶ 14–15.) Louis also testified that the purpose of the painting was to make certain poles and beams in the first floor "look cleaner." (Louis Aff. ¶ 17; Defs. Cross 56.1 Stat. ¶ 53.)

Because the nature of Lin's work is under genuine dispute, the Court denies summary judgment on the issue whether the construction-related exclusion covers Lin's injury.

\* \* \*

The Court finds genuine issues of material fact preclude a determination about whether the construction-related exclusion covers Lin's injury. However, the Court finds as a matter of law that the worker-related exclusion does not apply. The WW Defendants are entitled to summary judgment with respect to the applicability of the worker-related exclusion.

## C. The Duty to Defend

The parties also disagree whether USLI had a duty to defend WW in Lin's lawsuit. The "duty of an insurer to defend is broader than its duty to pay." Allianz Ins. Co. v. Lerner, 416 F.3d 109, 115 (2d Cir. 2005). The duty arises if "the allegations within the four corners of the underlying complaint potentially give rise to a covered claim," or if "the insurer has actual knowledge of facts establishing a reasonable possibility of coverage." Id. (citation and internal quotation marks omitted). It "extends to any action, however groundless, false[,] or fraudulent, in which facts are alleged within the coverage afforded by the policy." Lionel Freedman, Inc. v. Glens Falls Ins. Co., 267 N.E.2d 93, 94 (N.Y. 1971); see also Fitzpatrick v. Am. Honda Motor Co., Inc., 575 N.E.2d 90, 90 (N.Y. 1991). "Any doubt as to whether the allegations state a claim within the coverage of the policy must be resolved in favor of the insured and against the carrier." Euchner-USA, Inc. v. Hartford Cas. Ins. Co., 754 F.3d 136, 141 (2d Cir. 2014). Put another way, the duty to defend "perdures until it is determined with certainty that the policy does not provide coverage." Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 620 (2d Cir. 2001) (emphasis in original).

The evidence establishes, as a matter of law, that USLI had a duty of defend in Lin's lawsuit. The record shows that, 10 days after receiving Lin's amended complaint, USLI decided to defend WW in the state lawsuit. (See 7/23/15 Letter at 1–2.) Lin's amended complaint suggested that the accident might be covered. The pleadings alleged that a WW employee in his course of employment drove the WW-owned forklift that injured Lin. (See Lin, D.E. # 16 ¶¶ 12, 20–22, 26, 31, 33, 35.) Lin's employment status and the relationship between the painting and WW's work remained unresolved. Because there is a "possible factual or legal basis on which [USLI] might eventually be held to be obligated to indemnify" WW, USLI was required to defend

WW in the lawsuit. <u>Allianz Ins.</u>, 416 F.3d at 115. The possibility of coverage subsisted throughout the state-court litigation, and the duty to defend thus did not extinguish. <u>See Hugo Boss Fashions</u>, 252 F.3d at 620. Accordingly, the Court grants summary judgment in favor of the WW Defendants on the issue of USLI's duty to defend WW in the state-court action.

### III.    WW's Counterclaims

USLI and WW have also filed cross-motions for summary judgment on each of WW's counterclaims. These claims are discussed in turn.

### A.    Breach of Contract and Implied Covenant Counterclaims

The Amended Complaint alleges two theories for USLI's breach of contract: (1) disclaiming coverage "when there is no basis to disclaim coverage," and (2) "belatedly asserting" a rescission claim "when there is no basis for such a claim." (Counterclaims ¶ 41.) USLI asked for dismissal of the breach of contract counterclaims. (<u>See</u> Pl. Br. at 25.) The Court denies USLI's request because issues of material fact exist about whether USLI had a basis to disclaim coverage. WW's breach of contract counterclaims may proceed.

However, "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." <u>Harris v. Provident Life & Accident Ins.</u>, 310 F.3d 73, 81 (2d Cir. 2002). The Court finds that the same factual basis underlies both the breach of contract and implied covenant claims. The Court therefore grants USLI's request for dismissal of the implied covenant claim. <u>See, e.g.</u>, <u>Zarour v. Pacific Indem. Co.</u>, 113 F. Supp. 3d 711, 717 (S.D.N.Y. 2015); <u>Yu v. Vassar Coll.</u>, 97 F. Supp. 3d 448, 482 (S.D.N.Y. 2015); (<u>see also</u> Pl. Br. at 21–22).

### B.   Bad Faith Counterclaim

The Court grants summary judgment in USLI's favor on WW's bad faith counterclaim. "The duty of 'good faith' settlement is an implied obligation derived from the insurance contract." Pavia v. State Farm Mut. Auto. Ins. Co., 626 N.E.2d 24, 27 (N.Y. 1993).  "[I]nsurers typically exercise complete control over the settlement and defense of claims against their insureds, and, thus, under established agency principles may fairly be required to act in the insured's best interests." Id.  Accordingly, "an insurer may be held liable for the breach of its duty of 'good faith' in defending and settling claims over which it exercises control on behalf of its insured." Selective Ins., 47 N.E.3d at 462.  To prove a bad faith claim, an insured must establish that (1) "a demand for settlement was made," Pavia, 626 N.E.2d at 28, and that (2) "the insurer's conduct constituted a 'gross disregard' of the insured's interests—that is, a deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering a settlement offer," Selective Ins., 47 N.E.3d at 462.  The insurer must have "engaged in a pattern of behavior evincing a conscious or knowing indifference to the probability that an insured would be held personally accountable for a large settlement if a settlement offer within the policy limits were not accepted." Pavia, 626 N.E.2d at 27–28.

USLI argues that the "level of culpable conduct simply is not present in this action," and that any of its conduct "does not even come close to the 'gross disregard for its policy obligations'" needed to support a bad faith claim.  (Pl. Br. at 24.)  WW offers no evidence of gross disregard, instead arguing that the claim is "premature because there has not been a finding whether WW is liable in connection with the Underlying Action or the amount of any such judgment." (Defs. Opp'n/Cross Br. at 34.)  This plea comes too late; the counter-defendant has already requested post-discovery summary judgment.  WW fails to provide "specific evidence demonstrating the

35

existence of a genuine issue of material fact" with respect to gross disregard. Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). Accordingly, the Court grants summary judgment in favor of USLI as to this claim.

### C.     Attorneys' Fees for WW

Finally, WW requests attorney's fees incurred defending against this declaratory judgment action. (See Defs. Opp'n/Cross Br. at 32–34.) "[A]n insurer's duty to defend an insured extends to the defense of any action arising out of the occurrence, including a defense against an insurer's declaratory judgment action," so long as the insured "prevails on the merits." U.S. Underwriters Ins. Co. v. City Club Hotel, LLC, 822 N.E.2d 777, 780 (N.Y. 2004). The rule applies even if the insurer defended the insured in the underlying tort suit. See id. However, the duty to pay for attorneys' fees applies only "in a dispute over the insurer's duty to defend." Liberty Surplus Ins. Corp. v. Segal Co., 420 F.3d 65, 67 (2d Cir. 2005) (per curiam) (emphasis in original) (quoting Employers Mut. Cas. Co. v. Key Pharms., 75 F.3d 815, 824 (2d Cir. 1996) (per curiam)).

Although USLI defended WW in the underlying tort suit, it sought "judgment . . . declaring that it has no duty to defend" in this action. (D.E. # 46 at 7.) As discussed above, WW prevailed on its argument that USLI owed a duty to defend in the Lin state-court action. Under the logic of City Club Hotel, USLI must pay WW's attorney's fees in this action despite the remaining dispute of fact about USLI's duty to indemnify. See, e.g., Scottsdale Ins. Co. v. United Indus. & Constr. Corp., 137 F. Supp. 3d 167, 182 (E.D.N.Y. 2015) ("Courts have generally found that where an insured prevails in a duty to defend action, it is entitled to fees, even where the issue of indemnification remains unresolved.") (emphasis in original) (collecting cases). Indeed, USLI has not contested WW's entitlement to attorney's fees in its summary judgment papers.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART USLI's motion for summary judgment. The Court further GRANTS IN PART and DENIES IN PART WW's motion for summary judgment as well as W&T and Wong Tung's motion for summary judgment, to the extent it incorporates the arguments in WW's motion.

The Court grants summary judgment in favor of the WW Defendants with respect to USLI's rescission claim and its claim that Lin's accident falls within the worker-related exception. The Court finds that a genuine dispute of material fact precludes summary judgment regarding USLI's claim that it is not obligated to indemnify WW because Lin's accident falls within the construction-related exception. For the same reason, the Court denies summary judgment to USLI on WW's breach of contract claim. The Court grants summary judgment in favor of USLI with respect to WW's bad faith and implied covenant of good faith and fair dealing counterclaims. Further, the Court declares that USLI has a duty to defend WW in the <u>Lin</u> lawsuit. Finally, the Court awards attorney's fees incurred in this action to WW.

The Court DIRECTS the parties to file a proposed joint pretrial order by October 26, 2018. The Court respectfully REFERS the proposed order to Magistrate Judge Orenstein for review.

SO ORDERED.

Dated: September 28, 2018
Brooklyn, New York

s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge